**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ASHLEY POPA, individually and on behalf of all others similarly situated, | Case No. 2:19-cv-00450-WSS |
| Plaintiff, | |
| v. | |
| HARRIET CARTER GIFTS, INC., a Pennsylvania corporation, and NAVISTONE, INC., a Delaware corporation, | |
| Defendants. | |

**DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to LCvR 56(B)(1), Defendants Harriet Carter Gifts, Inc. ("Harriet Carter") and NaviStone, Inc. ("NaviStone") (together, "Defendants"), submit this concise statement of material facts which they believe to be undisputed and material to the Court's decision. The cited materials, which can be found in the concurrently filed Appendix, include: the Declaration of Larry Kavanagh, with accompanying exhibits ("Kavanagh Dec.") (Appendix Exhibit 1); Declaration of Chris Ludwig ("Ludwig Dec.") (Appendix Exhibit 2); Declaration of Greg Humphreys, with accompanying exhibits ("Humphreys Dec.") (Appendix Exhibit 3); transcript excerpts from the deposition of Plaintiff Ashley Popa ("Popa Dep.") (Appendix Exhibit 4); transcript excerpts from the deposition of Michael Springer ("Springer Dep.") (Appendix Exhibit 5); transcript excerpts from the corporate deposition of NaviStone ("NaviStone Dep.") (Appendix Exhibit 6); and transcript excerpts from the corporate deposition of Harriet Carter ("Harriet Carter Dep.") (Appendix Exhibit 7).

## NAVISTONE AND THE NAVISTONE SERVICES

1.      Founded in April 2016, NaviStone is a small marketing technology company with fewer than 30 employees located in Cincinnati, Ohio. Kavanagh Dec., ¶ 6.

2.      It has clients located across the United States which operate websites serving a national marketplace. Kavanagh Dec., ¶ 6.

3.      NaviStone provides its clients, primarily e-commerce retailers, with services (the "Services") that allow them to send direct mail promotions to people who visit their websites and demonstrate interest in product offerings, but leave the website without making a purchase. Kavanagh Dec., ¶ 8.

4.      The system it offers for doing so was built from the ground up to protect the anonymity of those visitors who chose not to disclose their identities to NaviStone's clients. Kavanagh Dec., ¶ 8.

5.      The data sent to NaviStone in connection with providing the Services is strictly segregated by and for the exclusive benefit of each client, and never disclosed to anyone outside of NaviStone. Kavanagh Dec., ¶ 8.

6.      In order to provide the Services, NaviStone worked with Harriet Carter to develop customized JavaScript code that would permit the pages of Harriet Carter's website to gather and send information directly to NaviStone. Kavanagh Dec., ¶ 8.

7.      Harriet Carter then installed the code on the individual pages of its website from which it would send information to NaviStone. Kavanagh Dec., ¶ 8.

8.      NaviStone considers itself to be acting on behalf of and under the authority of each of its individual clients to which it provides the Services. Kavanagh Dec., ¶ 9.

9.      In the case of Harriet Carter, NaviStone obtained and used data from Harriet Carter's website solely for providing Services to Harriet Carter. Kavanagh Dec., ¶ 9.

10.      NaviStone never combined Harriet Carter's data with the data any other clients. Kavanagh Dec., ¶ 9.

11.      From its founding, NaviStone has sought to protect the privacy of consumer information and preserve the anonymity of website visitors in connection with the Services; this commitment is described on NaviStone's website at www.navistone.com/consumer-privacy-0. Kavanagh Dec., ¶ 10 & Ex. C.

12.      While this page was last updated on October 3, 2019, to address concerns relating to the recently enacted California Consumer Privacy Act and the European privacy directive

commonly known as the GDPR, NaviStone's has always adhered to these core consumer privacy principles in providing the Services. Kavanagh Dec., ¶ 10.

13.    NaviStone never takes possession of or otherwise learns (or seeks to learn) the names and mailing addresses associated with anonymous browser visits to its clients' websites. Kavanagh Dec., ¶ 11.

14.    Nor are those names and addresses revealed to any of its clients. Kavanagh Dec., ¶ 11.

15.    The restrictions described in the preceding paragraphs exist solely for the purpose of protecting consumer privacy. Kavanagh Dec., ¶ 12.

16.    NaviStone's ability to maintain consumer anonymity has been a critical factor in its adoption by companies like Harriet Carter who share NaviStone's commitment to consumer privacy. Kavanagh Dec., ¶ 12.

17.    NaviStone is able to keep consumer names and address private through the use of a commonly used online process called "cookie syncing." Kavanagh Dec., ¶ 13.

18.    NaviStone's data contractor for cookie syncing, Neustar, Inc. ("Neustar") (www.home.neustar), has its own database of names and mailing addresses, and never discloses any of those names and addresses to NaviStone or its clients, including Harriet Carter. Kavanagh Dec., ¶ 13.

19.    NaviStone sends to Neustar a selected list of anonymous NaviStone cookie IDs (which are unique to each of NaviStone's clients) to which Neustar has "synced" to its own cookie IDs. Kavanagh Dec., ¶ 13.

20.    Neustar then produces a list of mailing addresses associated with its own (now synced) cookies, and sends that list directly (and solely) to American Computer Group d/b/a

Computech ("Computech") (www.acg-computech-direct.com), a service bureau retained by NaviStone to manage mailing lists for NaviStone's Services. Kavanagh Dec., ¶ 13.

21.     Neustar is never informed of the identity of the NaviStone client to which these anonymous cookie IDs relate. Kavanagh Dec., ¶ 14.

22.     For a Harriet Carter mailing, Neustar received Harriet Carter-specific cookie IDs from NaviStone, but was not told that those cookies were set on behalf of Harriet Carter or in any way associated with Harriet Carter; nor was Neustar advised that any subsequent promotional mailing would be on behalf of Harriet Carter. Kavanagh Dec., ¶ 14.

23.     Nor was Neustar ever provided any of the visitor browsing data associated with these anonymous IDs. Kavanagh Dec., ¶ 14.

24.     In this way, cookie syncing ensures that no one party has both visitor browsing data (including the website visited) and any correlated or associated names and addresses. Kavanagh Dec., ¶ 14.

25.     NaviStone, for its part, never shares browsing data with anyone. Kavanagh Dec., ¶ 14.

26.     NaviStone only provided its Services to Harriet Carter on one occasion based on an order placed by Harriet Carter on or about September 26, 2016. Kavanagh Dec., ¶ 5.

27.     In September or October 2016, NaviStone provided Harriet Carter with JavaScript code that Harriet Carter incorporated into its retail website, www.harrietcarter.com (the "Harriet Carter website" or the "website"). Ludwig Dec., ¶ 9.

28.     Working with NaviStone, the client determines the pages on which to install NaviStone's code. Ludwig Dec., ¶ 10.

29.     NaviStone did not (and does not) have the ability to incorporate its code onto a client's website, including Harriet Carter's website; nor can it remove the code from the client's website at the termination of a business relationship with a client. Ludwig Dec., ¶ 10; NaviStone Dep., vol. 1 at 118:15-20.

30.     Only the client has the ability to install or uninstall any JavaScript code on its own website which, once installed, becomes a part of the client's website pages. Ludwig Dec., ¶ 10.

31.     Once installed by the client, NaviStone's code begins to run when the website page which includes the code is fully rendered and loaded in the visitor's web browsing software. Ludwig Dec., ¶ 11.

32.     This was an intentional design decision, as NaviStone did not want the code to begin running until the web site page being visited had been fully delivered to the visitor. Ludwig Dec., ¶ 11.

33.     To ensure this, NaviStone programmed an additional delay in the operation of the code of one (1) second. Ludwig Dec., ¶ 11.

34.     Because the code is part of the web page on which it is installed, it stops running as soon as the visitor leaves that page. Ludwig Dec., ¶ 12.

## OPERATION OF THE NAVISTONE CODE

35.     **Step One.** After a page is fully rendered and loaded in the visitor's web browser, the code obtains information from that loaded page and sends it directly to NaviStone servers located in Virginia and hosted by Amazon Web Services.  Ludwig Dec., ¶ 13.

36.     **Step One Details.**  The process described in the preceding paragraph occurs only *after* the client's web server has received the web page request from the visitor, and after the

client's web server has fully delivered the requested page and it is presented as a fully formed page in the visitor's web browsing software. Ludwig Dec., ¶ 14.

37.     NaviStone does not have access to or otherwise obtain, view, or capture the communication from the visitor to the website server which requested the visited web page. Ludwig Dec., ¶ 14.

38.     This is true whether or not that page is being navigated to from another website or from another page within the client's website. Ludwig Dec., ¶ 14.

39.     The code does not have access to otherwise obtain or capture the response from the website server, *i.e.*, the requested webpage, until the communication is received and fully rendered as a web page in the visitor's web browser. Ludwig Dec., ¶ 14.

40.     It was Harriet Carter's placing of the code on the pages of its website that gave NaviStone access to the information on those pages and the ability to gather that information once the web is loaded. Ludwig Dec., ¶ 14.

41.     **Step One Information Collection and Communication.** In connection with step one, NaviStone's software collects limited categories of information from the loaded pages of the website page on which it is installed. Ludwig Dec., ¶ 15.

42.     The information on those loaded pages originated entirely from Harriet Carter's servers. Ludwig Dec., ¶ 15.

43.     For example, from a loaded product page, the software collects the web address of the page, item numbers, the web address of product images, and the pathname. Ludwig Dec., ¶ 15.

44.     From loaded shopping cart pages, the software collects the product name, the product identifier, product quantity, unit price, the web address of the product image, shipping and tax charges, and product attributes. Ludwig Dec., ¶ 15.

45.    **Step Two.**  After a page has been fully rendered in the visitor's web browser and NaviStone's code is running, the web page sends information to NaviStone in response to one "click event" which may occur on the page; that single click event is the visitor's clicking on an "add to shopping cart" button if one exists on the page. Ludwig Dec., ¶ 16.

46.    No other "click events" caused information to be sent to NaviStone. Ludwig Dec., ¶ 16.

47.    **Step Two Details.**  The "add to cart" click event causes a communication to be sent to NaviStone when the user clicks an add to cart button. Ludwig Dec., ¶ 17.

48.    JavaScript allows the web page to recognize when defined events occur, and to take an action in response to those events such as this "add to cart" click event. Ludwig Dec., ¶ 17.

49.    One such response, for example, is to cause the visitor's browser to send information to a web server, including the web server of a third party like NaviStone. Ludwig Dec., ¶ 17.

50.    The "add to cart" button being clicked on the Harriet Carter website may have other actions associated with it, but these are independent of and not related to the and not related to the action of sending information to NaviStone. Ludwig Dec., ¶ 17.

51.    So, for example, a user clicking on an "add to cart" would likely *also* trigger a communication to Harriet Carter's website server (with instructions about what to place in an online shopping cart). Ludwig Dec., ¶ 17.

52.    NaviStone, however, did not have access to that communication to Harriet Carter and the communication to NaviStone did not depend in any way on whether the click had communicated at all with the Harriet Carter server; these were entirely separate and independent communications, and they could happen in any order. Ludwig Dec., ¶ 17.

53.     **Step Two Information Communication.**  The click event described above causes a signal to be sent from the webpage to NaviStone that "an add to cart button has been clicked;" it contains no further information about the event. Ludwig Dec., ¶ 17.

54.     NaviStone's code did not have access to any communication to the Harriet Carter server (or anyone else) triggered by the "add to cart" click event. Ludwig Dec., ¶ 18.

55.     **Step Three.**  After a page has been fully rendered in the visitor's web browser and NaviStone's code is running, the web page sends information to NaviStone's server if a "change event" has occurred relating to certain form fields. Ludwig Dec., ¶ 19.

56.     Specifically, when a person tabs out of a form field, the code will detect whether the content of the form field has changed. Ludwig Dec., ¶ 19.

57.     **Step Three Details.**  For the period beginning on June 20, 2017, the "change event" described above causes the number "1" to be sent to NaviStone if the content of the form field appears to be formatted like an email address. Ludwig Dec., ¶ 20.

58.     The content of the form field is not transmitted to NaviStone. Ludwig Dec., ¶ 20.

59.     The JavaScript code will only load if it receives permission to do so from the visitor's web browser. Springer Dep. at 29:17-18.

60.     The JavaScript code will not run if the user has disabled JavaScript. Springer Dep. at 26:19-27:1.

61.     Third-party extensions, such as ad blockers, can be used to identify specific domains which will be denied the ability to load certain information, preventing the JavaScript code from performing its functions. Springer Dep. at 27:2-6.

62.     A user can reroute domains from resources so that they will either not load or come from an alternative location, which prevents the JavaScript from performing its functions. Springer Dep. at 27:17-19.

63.     Disabling cookies would prevent the JavaScript from performing its functions. Springer Dep. at 27:20-28:2.

64.     NaviStone cannot remove the code from the client's website at the termination of a business relationship with a client. Ludwig Dec., ¶ 10.

65.     Only the client has the ability to install or uninstall any JavaScript code on its own website. Ludwig Dec., ¶ 10; Springer Dep. at 34:16-19.

66.     All of the information that is collected by NaviStone's code is transmitted to NaviStone's servers in Virginia in the form of raw data. Ludwig Dec., ¶ 21; Springer Dep. at 25:3-9.

67.     Within each client's raw data, the information received by NaviStone is associated with the anonymous cookie ID that is created for each visitor to the client's website. Ludwig Dec., ¶ 21.

68.     This cookie ID is set under the domain of client's website and, as a result, is a "first party" cookie. Ludwig Dec., ¶ 21.

69.     For example, the cookie ID set in connection with NaviStone's work for Harriet Carter is a Harriet Carter-domain cookie ID, and the ID is unique to Harriet Carter. Ludwig Dec., ¶ 21.

70.     While the code also sets a NaviStone-domain cookie ID that is the same website operates across multiple domains, this ID is not used by NaviStone for any purpose. Ludwig Dec., ¶ 21.

71.     The NaviStone code sets a unique and different anonymous client-domain ID and cookies on each browser instance on each device visiting the client's website. Ludwig Dec., ¶ 22.

72.     NaviStone has no way of knowing, nor does it attempt to learn, whether those anonymous IDs are in any way connected or related to the same individual or household; they appear to NaviStone as different anonymous browsers instances each with a unique ID and unique MGX cookies. Ludwig Dec., ¶ 22.

73.     NaviStone personnel do not access the "raw data" to obtain, derive, or otherwise ascertain personal information about website visitors. Ludwig Dec., ¶ 23.

74.     Rather, reports from the raw data are automatically generated on a nightly basis as a summary for each client-domain anonymous ID (the "summaries"), and those summaries have no personally identifiable information of any kind. Ludwig Dec., ¶ 23.

75.     The summaries presented high-level, anonymous information, including the number of site visits made by each anonymous visitor for which a NaviStone cookie ID has been set, the number of months it had been since an anonymous visitor went to the client's website, the number of product pages viewed by that visitor, and the number of carts into which the anonymous visitor had put items. Ludwig Dec., ¶ 24.

76.     NaviStone never used any of the information obtained by its JavaScript code to learn the identities of visitors to Harriet Carter's website. Ludwig Dec., ¶ 24.

**SCORING ANONYMOUS BROWSER IDS**

77.     When the NaviStone code first ran on a browser instance visiting Harriet Carter's website, the Harriet Carter website instructed the browser instance visiting the site to create an anonymous ID for the visitor; to send that ID to NaviStone; and to put that ID into a cookie. Ludwig Dec., ¶ 26.

10

78.     NaviStone summarized non-personally identifiable information associated with each anonymous ID (which were unique to Harriet Carter) and created a score that indicated the likelihood that a visitor would respond to a piece of direct mail. Ludwig Dec., ¶ 27.

79.     NaviStone used only data sent to it by Harriet Carter web pages to create a score for anonymous Harriet Carter visitors. Ludwig Dec., ¶ 28.

80.     Only 5-10% of visitors to most websites score high enough that it makes economic sense for the retailer to send a mailing. Ludwig Dec., ¶ 29.

81.     By excluding 90-95% of visitors from consideration, NaviStone eliminates wasteful mailings to website visitors, which reduces needless paper use and prevents the vast majority of visitors from receiving a mailing. Ludwig Dec., ¶ 30.

82.     [Paragraph intentionally left blank to preserve numbering.]

## ANONYMOUS COOKING-SYNCING

83.     To facilitate the creation of a mailing list, the code creates anonymous, client-specific visitor IDs and sends those, and nothing else, to a data provider, Neustar, that has independently built a "telephone book" of mailing addresses associated with Neustar's own cookie IDs. Ludwig Dec., ¶ 31.

84.     This was the only data sent to Neustar.  Ludwig Dec. at ¶ 31; Springer Dep. at 18:21-19:8.

85.     If Neustar had previously placed a cookie on that same a browsing instance being used to visit Harriet Carter, Neustar sent NaviStone a signal—equivalent to a "yes" or "no"—to indicate whether it had a mailing address associated with Neustar's own ID on the same browser instance. Ludwig Dec., ¶ 32; Springer Dep. at 23:1-14.

86.     NaviStone is never provided with or otherwise learns the Neustar ID, or with any names or addresses associated with the Neustar ID. Ludwig Dec., ¶ 32.

87.     This practice is called "cookie syncing," and is a commonplace practice for retail and commercial websites. Ludwig Dec., ¶ 33.

88.     With IDs synced, Neustar can then create a list of mailing addresses corresponding to a list of synced NaviStone IDs. Ludwig Dec., ¶ 33.

89.     Cookie syncing can only happen when Neustar has its own pre-existing cookie ID on the visitor's web browser instance at the time the NaviStone code sends its anonymous, client-specific ID to Neustar for that same browser instance. Ludwig Dec., ¶ 34.

90.     Because NaviStone's anonymous visitor ID (or "cookie") was set on a browser instance and not connected to any particular person, NaviStone had no way of knowing whether the "match" provided by Neustar was accurate or reflected the actual identity or mailing address of the person who was visiting the client's website at the time that cookie was set. Ludwig Dec., ¶ 35.

91.     The connection between the anonymous ID in other words is inferential only, and subject to error; NaviStone simply has no way of knowing if the name or mailing address synced by Neustar is accurate. Ludwig Dec., ¶ 35.

92.     Those names and addresses are never revealed to NaviStone. Ludwig Dec., ¶ 35.

93.     A browser instance is created when a person launches a web browsing program, *e.g.*, Safari, on his or her computer, smartphone, or tablet and then surfs the web with that browser. Ludwig Dec., ¶ 36.

94.     If that same person launches another browser, *e.g.*, Chrome, on the same device, a different browser instance is created. Ludwig Dec., ¶ 36.

95.     Likewise, if that same person launches one or more of these browsers on a different computer, smartphone, or tablet, each browser use creates a separate different browser instance for each of those devices. Ludwig Dec., ¶ 36.

96.     Each browser instance creates a different, client-domain anonymous visitor ID for each client of NaviStone that the web browser instance visits, and that ID will be different for each client's website. Ludwig Dec., ¶ 36.

97.     If Individual A surfed the web on a personal computer using Safari, Chrome, and Opera (another browser), that individual would have three browser instances on that computer, and, if that person used each of those programs to visit Harriet Carter's website, NaviStone's code would set a different anonymous ID for each browser instance. Ludwig Dec., ¶ 37.

98.     Because NaviStone has no way of correlating those different anonymous IDs among the different browsers—or across multiple devices—it would appear to NaviStone as if (in this scenario) three different individuals came to the Harriet Carter website, and NaviStone would never know that it was Individual A using any of these different browsers. Ludwig Dec., ¶ 37.

99.     For added security and privacy protection, Neustar is not provided with the identity of the websites or clients associated with the client-specific, anonymous IDs sent to it by NaviStone or any of the browsing data associated with that ID. Ludwig Dec., ¶ 38.

100.    Further, NaviStone never shares or provides access to browsing data sent to it to anyone, including its client. Ludwig Dec., ¶ 38.

101.    After receiving the list of mailing addresses from Neustar, Computech replaced the names on the Neustar mailing address list with names of the most active shoppers associated with those mailing addresses, which information was provided by, KBM Group, Inc. ("KBM Group") (www.kbmg.com), another vendor retained by NaviStone.  Kavanagh Dec., ¶ 15.

13

102.    NaviStone required this because it has no way to know whether names provided by Neustar to Computech were the actual persons who browsed the Harriet Carter website, and because using the name of the most active shopper at the address synced by Neustar increased response rates. Kavanagh Dec., ¶ 15.

103.    To ensure that consumer wishes were respected, Computech removed from the list provided by Neustar the names and addresses of persons who appear on client-specific and national "do not mail" lists. Kavanagh Dec., ¶ 16.

104.    For the only mailing list ever produced for Harriet Carter, the list was then sent, at the direction of Harriet Carter, to a third party processing company called Cross Country Computer, which added them to a larger mailing list for inclusion in a larger mailing. Kavanagh Dec., ¶ 17.

105.    NaviStone used only data sent to it by Harriet Carter's web pages to create a score for Harriet Carter's visitors. Kavanagh Dec., ¶ 27.

106.    No data was (or is) shared between or among NaviStone's clients. Kavanagh Dec., ¶ 28; Ludwig Dec., ¶ 40.

107.    No other client derived any use or obtained any benefit from Harriet Carter's data, and Harriet Carter did not derive any use or obtain any benefit from other clients' data. Kavanagh Dec., ¶ 28; Ludwig Dec., ¶ 40.

108.    NaviStone never combined (or combines) its clients' data for any purpose whatsoever, and it did (and does) not use its clients' data for any purposes of its own. Kavanagh Dec., ¶ 28; Ludwig Dec., ¶ 40.

109.    NaviStone has never built or attempted to build a database of names and addresses of visitors to its clients' website. Kavanagh Dec., ¶ 29.

110.     NaviStone specifically designed the Services to prevent it (and its clients) from learning the names and addresses of those visitors and creating such a database. Kavanagh Dec., ¶ 29.

111.     NaviStone never sold or rented data obtained from Harriet Carter's website (or the websites of its other clients), or otherwise disclose it to any third party. Kavanagh Dec., ¶ 30.

112.     NaviStone did (and does) not "track" users from one website to another. Kavanagh Dec., ¶ 31.

## MAILING LIST PRODUCTION

113.     NaviStone assigns a score to each anonymous visitor ID reflecting its prediction of the likelihood that the visitor will respond favorably to direct mail sent by the U.S. mail (an "engagement score"). Kavanagh Dec., ¶ 32.

114.     For the one mailing list produced for Harriet Carter in September or October 2016, NaviStone used the following information to score each visitor ID: (1) How many times did a visitor visit the Harriet Carter website? (2) How many months has it been since a visitor went to the Harriet Carter website? (3) How many product pages did the visitor view on the Harriet Carter website? (4) How many carts has a visitor put items into on the Harriet Carter website? Kavanagh Dec., ¶¶ 33.

115.     [Paragraph intentionally left blank to preserve numbering.]

## THE NAVISTONE-HARRIET CARTER AGREEMENT

116.     On or about August 4, 2016, Harriet Carter and NaviStone entered a service agreement (the "Agreement") so that Harriet Carter could test the NaviStone service. Kavanagh Dec., ¶ 7 & Ex. B.

117.    The Agreement specifically provided that, "[u]pon termination or expiration of the Agreement, NaviStone® will archive all Client Data on NaviStone's cloud servers for a period of thirty (30) days prior to deleting all Client Data in its possession." Kavanagh Dec., ¶ 9 & Ex. B.

118.    The Agreement required Harriet Carter (like all NaviStone clients) to warrant that it is "in full compliance with all applicable laws and marketing regulations regarding the privacy of its customers and the collection, use and disclosures of its customers' information." Kavanagh Dec., ¶ 12 & Ex. B at 3.

119.    It also obligated NaviStone not to disclose Client Data to any third party "except as reasonably required for NaviStone to provide its obligations under this Agreement or as required by law or court order." Kavanagh Dec., ¶ 12 & Ex. B at 2.

120.    The Agreement further required clients to publish via "a clear and conspicuous link" a privacy policy that explains to consumers the information collection and disclosure practices associated with the provision of the Services, and to provide a clear and easy to use means for opting out of direct mail promotions. Kavanagh Dec., ¶ 12 & Ex. B at 3-4.

121.    Harriet Carter complied with this requirement by posting a privacy policy linked from each page of its website satisfying these requirements. The policy also made clear that cookies could be disabled. NaviStone Dep., vol. 1 at 217:1-9; *see also* ECF No. 27, ¶¶ 3-5 & Exs. A & B.

122.    Harriet Carter considered the single mailing list produced for it by NaviStone in the fall of 2016 to be a failure and never went any further with the NaviStone product. Harriet Carter Dep. at 33:12-21.

123.    Harriet Carter considered its relationship with NaviStone to have ended after this failed test and never ordered from NaviStone again. Harriet Carter Dep. at 34:1-12.

## PLAINTIFF'S VISITS TO THE HARRIET CARTER WEBSITE

124.    Plaintiff first visited the Harriet Carter retail website, www.harrietcarter.com, in the beginning of 2018, using the Safari browser on her iPhone. Popa Dep. at 40:4-5, 99:16-20.

125.    On her visit, Plaintiff was asked to provide her email and did so, used the search bar to search for pet steps or stairs, and added one or more items to a shopping cart. Popa Dep. at 39:18-22; 42:3-6, 17-19; 115:17-19.

126.    Plaintiff has no record of Harriet Carter or NaviStone or cookies associated with either Defendant on the smartphone she used to access the Harriet Carter website. Popa Dep. at 45:22-46:18, 66:18-22.

127.    That phone was the only device she used to visit the website and is no longer in her possession. Popa Dep. at 54:3-6, 64:23-65:2.

128.    Pursuant to LCvR 56(B)(1), Defendants assume for purposes of their summary judgment motion that the NaviStone code described above acted on the browser instance or instances when she visited the Harriet Carter website.

129.    At this time, the JavaScript provided by NaviStone, installed by Harriet Carter, and assumed for purposes of Defendants' motion to have been running inside Plaintiff's browser, did not transmit the content of any form field. Springer Dep. at 49:5-9; 210:21-211:11.

130.    At this time, the JavaScript did not collect key stroke information. Springer Dep. at 49:12-13.

## THE UBIQUITY OF ANALYTICS ENGINES

131.    It is very common for a website to send data about pages viewed by a visitor, or the details of that visitor's interactions with a website, to a technology partner for a number of purposes, including marketing. Kavanagh Dec., ¶ 34.

132.     In fact, the vast majority of modern websites rely on multiple technology partners to function, and would not be able to do so without the transmission of such data to third parties. Kavanagh Dec., ¶ 35.

133.     A website accomplishes this task by instructing the web browsing software used by a visitor to make direct transmissions of information from its web pages to the technology partner including via JavaScript code like the code created by NaviStone. Kavanagh Dec., ¶ 36.

134.     Third-party analytics engines are ubiquitous and customary, and underlie much of the ordinary course of operation of the Internet. Humphreys Dec., ¶ 32.

135.     For example, tens of millions of websites employ Google Analytics to gather information concerning visits to their sites. Kavanagh Dec., ¶ 37; Humphreys Dec., ¶¶ 20–22.

136.     Google Analytics collects browsing data in the same way that NaviStone does. Kavanagh Dec., ¶ 38; Humphreys Dec., ¶ 22.

137.     In both cases, the website owner is provided with a line of JavaScript code to insert into the pages of his or her site. Kavanagh Dec., ¶ 38; Humphreys Dec., ¶¶ 20–22.

138.     In both cases, that JavaScript runs as a part of the website, and causes transmissions to be made directly by the webpage to the service provider's server—Google's server in the case of Google Analytics. Kavanagh Dec., ¶ 39; Humphreys Dec., ¶¶ 24-25.

139.     They each transmit similar kinds of information, including the website pages visited, the number of pages visited, and activities undertaken on those pages, although the kinds of information transmitted by the NaviStone code is far more limited that what is transmitted by Google Analytics' code. Kavanagh Dec., ¶ 38; Humphreys Dec., ¶¶ 24-25.

140.     Google Analytics is designed to do things that NaviStone does not do. Kavanagh Dec., ¶ 39; Humphreys Dec., ¶ 22.

141.    For example, Google combines the browsing data of visitors across all the sites they visit which contain the Google Analytics code, and uses that data for purposes of providing marketing services to all participating websites. Kavanagh Dec., ¶ 40.

142.    NaviStone does neither of those things. Kavanagh Dec., ¶ 40.

143.    NaviStone does not collect browsing data of visitors outside of the websites of its individual clients, *i.e.*, data collected for Harriet Carter was only collected from the Harriet Carter website visits; information sent to NaviStone concerning visits to one client's website, *e.g.*, Harriet Carter's website, remains at all times segregated from information obtained concerning visits to the websites of NaviStone's other clients; and none of the information sent to NaviStone is disclosed to anyone else or traded with third parties. Kavanagh Dec., ¶ 40.

144.    [Paragraph intentionally left blank to preserve numbering.]

145.    Plaintiff's Counsel's website, www.carlsonlynch.com is an example of a website that communicates with numerous third-party servers as it loads.  Humphreys Dec., ¶ 31.

146.    When a visitor's browser attempts to load www.carlsonlynch.com, the web site makes no less than 72 requests including requests to third-party servers. Humphreys Dec., ¶ 31.

147.    The Carlson Lynch website uses JavaScript to track a variety of data about visitors to that website, including Google Analytics.  Humphreys Rep. at 14.

148.    Carlson Lynch's decision to place a Google Analytics tag on its website causes information about a visitors browsing session to be transmitted to Google as that visitor browses the Carlson Lynch website.  Humphreys Rep. at 14.

149.    Such information includes what pages the visitor viewed, resolution of the visitor's monitor, size of browser window, and other data.  Humphreys Rep. at 6, 14.

150.    The website for the U.S. federal courts, after making 83 network requests to build its front page, also sends clickstream data to a third-party server via Google Analytics. Humphreys Dec., ¶ 32.

151.    The website for the Pennsylvania state courts uses 229 requests to build its front page, and collects a wide range of Google Analytics information. Humphreys Dec., ¶ 33.

152.    The website for the U.S. District Court for the Western District of Pennsylvania logs keystrokes typed into the search box and sends them to a third party (search.usa.gov). Humphreys Rep. at 18.

153.    Each of these requests communicates the personal IP address of the user, information about what kind of computer is being used, the time of day, each keypress made, and whether the user clicks the "search" button or not; indeed, *any* request made on the internet reveals the IP address of the requester. Humphreys Dec., ¶ 34; Humphreys Rep. at 23.

**PLAINTIFF'S OWN EXPERT SUPPORTS
NAVISTONE'S AND HARRIET CARTER'S DEFENSES**

154.    Plaintiff's expert, Michael Springer, analyzed the report of NaviStone's expert, Greg Humphreys, and did not find anything presented in it to be inaccurate.  Springer Dep. at 205:4-13.

155.    Plaintiff's expert agrees that, contrary to the allegations of Plaintiff's amended complaint, NaviStone's code is not encrypted and can be viewed by anyone who knows how to view source code of a web page.  Springer Dep. at 206:21-207:14.

156.    Plaintiff's expert agrees that after the summer of 2017, NaviStone did not collect the contents of information typed into form fields.  Springer Dep. at 209:7-17.

157.    Instead, Plaintiff's expert agrees that the only data related to form fields transmitted to NaviStone after August 2017 was the fact that a form field was filled out, not the contents of what was typed into the form field.  Springer Dep. at 210:21-211:18; 212:22-213:12.

158.    Plaintiff's expert admitted that while he could theorize that NaviStone could track users "across websites," he had no evidence of this beyond the fact that NaviStone used a single cookie ID for browser instances, and that it was possible to have a single cookie identifier and not track users across web pages.  Springer Dep. at 213:13-214:3.

159.    Plaintiff's expert further admitted that he had no evidence that NaviStone was using its single cookie identifier to track users across websites.  Springer Dep. at 214:24-215:11.

160.    Plaintiff's expert also admitted that to the best of his knowledge, Google does track users across sites with its JavaScript code, unlike NaviStone. Springer Dep. at 214:14-215:11.

161.    Plaintiff's expert agreed that at the time the Pennsylvania Wiretapping and Electronic Surveillance Control Act was passed, there was no equivalent in communications to the World Wide Web.  Springer Dep. at 219:13-23.

162.    Plaintiff's expert admitted that the communications between a web user's browser and NaviStone are separate and distinct from a web user's communications to Harriet Carter. Springer Dep. at 229:14-23.

163.    Plaintiff's expert admitted that when a user fills out a form field but does not submit it, there is no communication to Harriet Carter, but instead a direct communication to NaviStone. Springer Dep. at 111:8-14; 114:18-116:6.

164.    Plaintiff's expert admitted that NaviStone's JavaScript did not transmit personally identifiable information about web visitors to Neustar.  Springer Dep. at 119:18-120:7.

21

165.    Plaintiff's expert admitted that while he is not an expert in behavior tracking software, he understood click event tracking to be common in JavaScript code and had no reason to believe that other kinds of event tracking were uncommon.  Springer Dep. at 123:12-124:22.

166.    Plaintiff's expert acknowledged that Google Analytics is commonly used on websites and agreed that it was likely present on at least 29 million web sites.  Springer Dep. at 142:7-18.

167.    Plaintiff's expert agreed that Google Analytics utilizes click events to send information to Google's servers.  Springer Dep. at 143:2-5.

168.    Plaintiff's expert acknowledge that Google Analytics appears to have the capacity to transmit data based on blur events, though he did not personally know whether it did so. Springer Dep. at 142:19-143:1.

169.    Plaintiff's expert admitted that after a web page running Google Analytics loads, Google Analytics causes data about that web page to send information about the web page to Google.  Springer Dep. at 143:6-8.

170.    Plaintiff's expert admitted that JavaScript is "sandboxed;" that is, it cannot access information outside the browser window in which it is running or child windows created by the parent window, so it cannot access a computer's file system directly.  Springer Dep. at 145:18-146:1.

171.    Plaintiff's expert agreed that when a browser loads a web page, content for that web page comes from both the web page's own servers and from third party servers, and that this is a longstanding practice in web development.  Springer Dep. at 160:6-161:20.

172.    Plaintiff's expert stated that absent knowing the content of any particular communication, he could not determine which communications to third-party servers would constitute an interception and which would not.  Springer Dep. at 164:4-13.

173.    Plaintiff's expert stated that in his opinion, the use of Google Analytics on Carlson Lynch's website causes information about what links visitors to [www.carlsonlynch.com](www.carlsonlynch.com) click to be sent to Google, including whether a visitor had clicked on the link entitled "Are you an exotic dancer?" Springer Dep. at 167:11-168:9.

174.    Plaintiff's expert also conceded that under his view, this transmission would amount to an "interception."  Springer Dep. at 168:3-7.

175.    Plaintiff's expert stated that because he did not provide "express consent" to Carlson Lynch for it to transmit click information to Google, Carlson Lynch's doing so would constitute wiretapping under his understanding of Pennsylvania law.  Springer Dep. at 175:1-6.

Dated: November 13, 2020

Respectfully submitted,

*/s/ Emily B. Thomas*
Emily B. Thomas
BAKER & HOSTETLER LLP
2929 Arch Street Cira Centre | 12th Floor
Philadelphia, PA 19104-2891
ethomas@bakerlaw.com

Paul G. Karlsgodt
BAKER & HOSTETLER LLP
1801 California Street, Suite 4400
Denver, Colorado 80202
pkarlsgodt@bakerlaw.com

Carrie Dettmer Slye
BAKER & HOSTETLER LLP
312 Walnut Street, Suite 3200
Cincinnati, Ohio 45202-4074
cdettmerslye@bakerlaw.com

*Attorneys for Defendant Harriet Carter Gifts, Inc.*

*/s/ David W. Bertoni*
David W. Bertoni (*pro hac vice*)
David Swetnam-Burland (*pro hac vice*)
Eamonn Hart (*pro hac vice*)
dbertoni@brannlaw.com
BRANN & ISAACSON
184 Main Street
P.O. Box 3070
Lewiston, ME 04243-3070
Tel. (207) 786-3566

Devin Chwastyk (*pro hac vice*)
I.D. No. 91852
Rachel Hadrick
I.D. No. 316383
MCNEES WALLACE & NURICK LLC
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108-1166
(717) 232-8000
(717) 237-5300 (fax)
dchwastyk@mcneeslaw.com
rhadrick@mcneeslaw.com

*Attorneys for Defendant NaviStone, Inc.*