UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASHLEY POPA, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>HARRIET CARTER GIFTS, INC., a Pennsylvania corporation, and NAVISTONE, INC., a Delaware corporation,<br><br>        Defendants. | Case No. 2:19-cv-00450-WSS |

**DEFENDANT NAVISTONE, INC.'S OPPOSITION
TO PLAINTIFF'S MOTION TO COMPEL**

    Plaintiff Ashley Popa ("Plaintiff" or "Popa") has filed a motion to compel (ECF 137) Defendant NaviStone, Inc. ("NaviStone") to provide supplemental interrogatory answers with information NaviStone does not know; to produce documents that do not exist; and to sit for a costly second corporate deposition on topics about which it has no knowledge.

    Moreover, the discovery Plaintiff seeks to compel—information about visits to Harriet Carter's privacy policy *by persons other than herself*—plays no part in resolving the limited issues to be addressed on remand: "location, privacy policy, and consent." ECF 126 at 1. As the Third Circuit took pains to note, it is evidence of the presence and content of a privacy policy, not whether Plaintiff or anyone else read it, which holds the key to implied consent, the issue which Plaintiff leans on to justify her requests. *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 132 (3d Cir. 2022) (the question is "whether Harriet Carter posted a privacy policy and, if so, whether that policy sufficiently alerted Plaintiff that her communications were being sent to a third party").

With briefing now complete, and for all the reasons set forth herein, NaviStone respectfully asks the Court to deny Plaintiff's motion.

## I. PROCEDURAL BACKGROUND

**Initial Proceedings in This Court.** Plaintiff filed a complaint alleging that Defendants NaviStone and Harriet Carter Gifts, Inc. ("Harriet Carter") violated Pennsylvania's Wiretapping and Electronic Surveillance Control Act (WESCA), 18 Pa. C.S. § 5701 *et seq.* through their use of ordinary web analytics tools. ECF 24–1. At the close of all discovery, Defendants moved for summary judgment, arguing that they were entitled to summary judgment because (1) no "interception" occurred; (2) even if one did occur, Plaintiff consented, which is a complete defense; and (3) the alleged interception did not occur in Pennsylvania, making WESCA inapplicable. This Court ruled that no interception occurred, and further found that, even if one did, it took place outside of Pennsylvania; but it did not resolve the consent issue. ECF 116 at 15, 17.

**The Court of Appeals Decision.** The Court of Appeals vacated this Court's grant of summary judgment, holding that the activities at issue—direct communications between Plaintiff and NaviStone—could constitute an interception based on a 2012 statutory amendment to WESCA. *Popa*, 52 F.4th at 129. The panel further concluded that the interceptions occurred at the place from which Plaintiff browsed Harriet Carter's website. *Id.* at 131. It noted that, in addition to Plaintiff's browsing location, consent was an unresolved defense to be addressed on remand, explaining that implied consent could be found even though Plaintiff did not visit Harriet Carter's privacy policy. *Id.* at 132 (the question is "whether Harriet Carter posted a privacy policy and, if so, whether that policy sufficiently alerted Popa that her communications were being sent to a third party").

**Proceedings On Remand.** On the return of the case, this Court authorized a short, topic-limited supplemental discovery period by order dated November 7, 2022. ECF 126. Specifically, the parties were allowed to conduct additional discovery until January 31, 2023, on "location, privacy policy, and consent." *Id.* at 1. On December 9, 2022, Plaintiff served written discovery requests upon NaviStone, and on January 11, 2023, Plaintiff served a notice seeking to depose NaviStone a second time. The proposed topics for examination focused on information concerning traffic to Harriet Carter's website, specifically its privacy policy. *See* ECF 137–5 at 3–4.[1]

**This Dispute.** After NaviStone served responses and objections to Plaintiff's written discovery requests (ECF 137–2), Plaintiff's counsel sent a letter claiming certain deficiencies (ECF 137–3) to which NaviStone provided a written response (ECF 137–4). The parties met and conferred but could not resolve the disputes Plaintiff now raises. NaviStone also objected to Plaintiff's 30(b)(6) deposition notice, *see* Hart Dec., Ex. E; again, the parties met and conferred, but reached an impasse on the issues raised in Plaintiff's motion.

---

[1] When NaviStone explained to Plaintiff's counsel that taking a repeat deposition of a witness required leave of court, the Plaintiff noticed the deposition of Larry Kavanagh, NaviStone's corporate representative, on an "individual" basis in an admitted effort to avoid the deposition limitations of the rules and cover the same terrain it would have covered in a repeat Rule 30(b)(6) deposition of NaviStone. *See* Declaration of Eamonn Hart ("Hart Dec.") ¶ 4 & Ex. A at 2 (email stating that Plaintiff would withdraw the individual deposition notice if NaviStone acceded to a second Rule 30(b)(6) deposition). While NaviStone acknowledges Plaintiff's technical right to notice Mr. Kavanagh's deposition in his individual capacity, his deposition would likewise be subject to the subject-matter limits imposed by the Court. NaviStone would have the right to terminate either variety of deposition, individual or corporate, if Plaintiff's counsel strayed beyond those limits. *See* Fed. R. Civ. P. 30(c)(2) (counsel may instruct a deponent not to answer to "enforce a limitation ordered by the court").

## II. ARGUMENT

**A.** <u>Overview</u>

The Court permitted discovery on location, privacy policy, and consent. The motion to compel has nothing to do with location. Only Plaintiff knows where she was when she visited Harriet Carter's website. Nor does the motion seek evidence on the question of whether a privacy policy was posted on Harriet Carter's website or the content of that policy. Such information is publicly available via the "Wayback Machine," https://archive.org/web/, a free-to-all repository of historic website content which Plaintiff's own expert found to be "reliable;" in fact, Plaintiff's expert based his expert opinions on Wayback Machine-archived versions of Harriet Carter's website. ECF 90 at 194; *see also* ECF 109 at 4–5.[2]

Instead, Plaintiff seeks from NaviStone information and analyses concerning every visit by every single different IP address of all visitors to Harriet Carter's website and its privacy policy from 2017 to the present, information which may not exist and which NaviStone can neither search for nor extract using its existing databases and technology. Because NaviStone did not—indeed, could not—generate these information extracts, Plaintiff now paints as inadequate NaviStone's responses to Interrogatories 21–23 and Requests for Production 4–6.[3]

---

[2] Harriet Carter has produced copies of the privacy policy as it existed both before and after Plaintiff's visit to its website, which are materially identical. *See* Hart Dec., Ex. C and Ex. D.

[3] Though Plaintiff identifies three separate interrogatories and document requests, each goes to the same issue. That issue is also raised in the list of topics for the proposed second corporate deposition of NaviStone. *See* ECF 137–5 at 3–4. In short, Plaintiff seeks both written and oral discovery from NaviStone concerning visitor statistics for Harriet Carter's website, and specifically, Harriet Carter's privacy policy page. *See* ECF 137 at 12.

As explained below, it would take NaviStone several days of engineer time just to determine whether responding to Plaintiff's requests is feasible. *See* Declaration of Larry Kavanagh ("Kavanagh Dec.") ¶ 19. If the information Plaintiff has asked NaviStone to extract, organize, analyze, and error-check exists at all, it is contained in a "data lake" many terabytes in size into which text was automatically discarded each night. NaviStone, a small Ohio company, would need to divert its limited engineering staff to create brand new software tools to search the data lake—which it has never previously done—to determine whether it can (1) identify and extract IP addresses from this mass of alphanumeric text; (2) determine whether any of those IP addresses can be associated with visits to Harriet Carter's privacy policy: and, if so, (3) extrapolate, if possible, the amount of time spent on the privacy policy page during each separate visit by each IP address. NaviStone would then need to develop a protocol to test the nature and accuracy of any extracted data at additional time and cost, if, in fact, its nature and accuracy could be ascertained at all.

Moreover, as explained below, even if this costly and time-consuming text extraction and analysis effort were somehow to succeed and produce reliable results, it would not serve the purpose on which Plaintiff rests her claim of need: rebutting Defendants anticipated affirmative defense of consent. *See* ECF 137 at 12. Further, even if a meaningful relevance theory could be articulated by Plaintiff, the information she seeks was readily available from Google, which provides a service (Google Analytics) to which Harriet Carter subscribed during the period at issue. Unlike NaviStone, Google does compile and make available to its clients, via its Google Analytics service, both visitor IP addresses and page visit information. To NaviStone's knowledge, Plaintiff

made no effort whatsoever to obtain this information either directly from Google or from the owner and operator of the Harriet Carter business.[4]

**B.      The Discovery Sought Is Unnecessary, Seeks Compilations and Calculations of Information That Do Not Exist, and Is Unduly Burdensome for NaviStone.**

The discovery Plaintiff seeks from NaviStone is unnecessary, particularly when weighed against (1) the burden of even attempting to comply, and (2) the issue before the Court, which is whether *Plaintiff* consented to direct communications from her web browsing software to NaviStone. Plaintiff is unequivocal that she did not access or review Harriet Carter's privacy policy and that it remains her practice—even *after* suing Harriet Carter and NaviStone—not to access or review the privacy policies of websites she visits. *See* ECF 90 at 149. What others may or may not have done while browsing Harriet Carter's site is irrelevant to the issue of implied consent as articulated by the Court of Appeals: (1) whether a privacy policy was posted at the time of Plaintiff's alleged visit (which Plaintiff sought to dispute) and, if so, (2) whether that policy "adequately alerted a reasonable person to the interception." *Popa*, 52 F.4th at 132.

**1.      Plaintiff's written discovery requests seek information that is not important to resolving the case, may not exist, and would be burdensome both to identify and produce in a reliable form.**

A party may take discovery on any topic that is relevant, but the discovery requested must be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Rule 26 identifies several factors courts should consider, but particularly relevant here are "the importance of the discovery in resolving the issues" and "whether the burden or expense of the proposed discovery outweighs its benefit." *Id*. While a party must make a "reasonable effort" to answer interrogatories, it "is not

---

[4] Defendant Harriet Carter sold the assets of the business prior to this lawsuit being filed. Those assets included Harriet Carter's Google Analytics account. *See* Hart Dec., Ex. B (Harriet Carter's Amended Response to Plaintiff's Interrogatories, Response to Interrogatory No. 1).

required to conduct extensive research" to provide an answer. *Arena v. RiverSource Life Ins. Co.*, 2017 WL 6513056, *2 (D. N.J. Dec. 19, 2017).

Regarding document requests, "it has been long and widely held that the Court cannot compel a party to create new documents for the purpose of responding to a Request for Production." *Automotive Finance Corp. v. DZ Motors, LLC*, 2018 WL 11446277, *6 (D. N.J. Dec. 17, 2018); *see Mon River Towing, Inc. v. Industry Terminal & Salvage Co.*, 2008 WL 2412946, *1 (June 10, 2008) (same). "Particularly in the realm of electronic discovery, where the volumes of data can be vast and the costs of locating every responsive document can be enormous, this obligation does not require perfection." *In re Diiocyanates Antitrust Litig.*, 2021 WL 4295729, *6 (W.D. Pa. Aug. 23, 2021). "[T]here is no obligation on the part of a responding party to examine every scrap of paper in its potentially voluminous files." *Enslin v. Coca-Cola Co.*, 2016 WL 7042206, *3 (W.D. Pa. 2016) (brackets in original) (quoting *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 374 (S.D.N.Y. 2016)).

      **a.**    *The requested discovery is not important to resolving the remaining issues in this case*.

Plaintiff's argument turns on the notion that her implied consent to Harriet Carter's policy—which she says she did not read, ECF 90 at 149—somehow depends in some unarticulated way on the number of website visitors who may have read it, irrespective of why each of them individually did or did not do so. This argument does not warrant compelling further discovery from NaviStone for several reasons.

*First*, consent under WESCA does not require actual knowledge, but may be implied under an objective standard met where a reasonable person should know of the claimed interception. *See Popa*, 52 F.4th 121, 132 (3d Cir. 2022) (citing *Com. v. Byrd*, 235 A.3d 311, 319 (2020)); ECF 137 at 8 (same standard in Plaintiff's brief). As explained by the Third Circuit, the dispositive question

7

is not how many people read the privacy policy, but whether the policy existed and, if so, whether it adequately disclosed the practices at issue in this lawsuit. *Popa*, 52 F.4th at 132 ("The Defendants assert the privacy policy adequately alerted a reasonable person to the interception; hence Popa's conduct using the Harriet Carter website demonstrated she consented. Popa disagrees that the policy went far enough and, alternatively, contends there is a genuine issue of material fact about whether this policy even existed at the time she visited the Harriet Carter website.") (footnote omitted).

Plaintiff, for her part, offers *no* authority for the proposition that, in assessing the legal effect of a website's privacy policy, statistical information regarding view counts and browsing times—particularly where the Third Circuit took pains to note that viewing the policy is not required to show implied consent—is germane to a determination of whether Plaintiff, herself, impliedly consented.

Here, Harriet Carter has produced evidence showing both the existence and content of its website, and the privacy policy specifically, at the time of Plaintiff's alleged visits, exactly the information identified by the Third Circuit as pertinent to resolving the question of implied consent. This information is readily available to anyone using the Wayback Machine. *See* ECF 90 at 193–95. Thus, the necessary facts to resolve the question of implied consent are available to all and indisputable. Furthermore, the copies of the privacy policy Harriet Carter produced, which pre- and post-date Plaintiff's visit to the website, are materially identical, and both versions of the policy include a clear, plain English notice stating:

> We may from time to time contract with third party vendors to serve ads to our customers on our behalf across the Internet or to send our catalogs to customers whom we think may be interested in our products or services. To do this, the vendors will collect anonymous information about your visits to our Web site and your interaction with our products and services. This anonymous information is collected through the use of a cookie or pixel tag – industry standard technology

> used by most major Web sites. No personally identifiable information is collected in this process. They may also pool the anonymous information that they collect with other sources of information not collected during your visit to our website, which may include your name and mailing address.

*Compare* Hart Dec. Ex. C (HCG_0443 (Privacy Policy on June 1, 2017)) *with* Hart Dec. Ex. D (HCG_0429 (Privacy Policy on March 23, 2018)). Thus, the table has already been set fully for a decision on the legal question of implied consent.

*Second*, Plaintiff does not even argue that the information she seeks is needed to prove her affirmative case; rather, she only claims to need it to rebut Defendants' affirmative defense of consent. The number of visitors to the privacy policy *might* be important to that defense if Defendants were somehow basing the defense of consent on the argument that large numbers of people did, in fact, visit the privacy policy. They are not. Defendants have no intention of relying on irrelevant information they do not know, *i.e.*, the number of visitors to the Harriet Carter privacy policy over a span of five years and the time each one spent on that page. The relevant question for purposes of establishing implied consent is the presence and content of the policy, not some global website usage analysis.

*Third*, even if Plaintiff wanted to support her affirmative case with an argument that only a small percentage of visitors to the website elected to view the privacy policy, that argument will remain available if Defendants move for summary judgment. On summary judgment, the non-moving party is entitled to have reasonable factual inferences drawn in her favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Since Defendants cannot demonstrate the percentage, large or small, of visitors to Harriet Carter's website that visited the privacy policy, to the extent that the Court needs to draw an inference about the question, Plaintiff, not Defendants, will enjoy the benefit.

      **b.**     *The requested discovery is unduly burdensome.*

Plaintiff's argument that the discovery will not be unduly burdensome is based on a fundamental misunderstanding of NaviStone's data ingestion and storage functions. Plaintiff assumes that because certain information is originally sent to NaviStone, NaviStone can readily retrieve, analyze, and summarize any aspect of that information. As NaviStone carefully explained to Plaintiff's counsel in the fall of 2021 and again during the "meet and confer" that led to this motion, this is not correct.

When a visitor browses the website of a NaviStone client—assuming the visitor has JavaScript enabled and is not utilizing software that would prevent NaviStone's software from running—the JavaScript causes text to be sent to NaviStone's servers after each successful page load. Kavanagh Dec. ¶¶ 10–11. That text is temporarily stored on NaviStone's servers while, each night, information in the limited categories that NaviStone relies upon to run its algorithm is pulled into a database as to which NaviStone can run queries. *Id.* ¶ 12. That database does not contain IP addresses or information about visits to privacy policies because that information is not relevant to the services NaviStone provides. *Id.* ¶¶ 12–13.[5] The text is then discarded to what is colloquially known as a vast "data lake" many terabytes in size. *Id.* ¶ 14.

---

[5]The parties agree on the fact that NaviStone received very limited categories of anonymized information and used even less to provide its service. *See* ECF 93 at 7, ¶¶ 41–44; ECF 99 at 11–12, ¶¶ 41–44 (admitted). For the one mailing NaviStone did for Harriet Carter in 2016, NaviStone used the number of visits to the website; how many months since the last visit; the number of product pages viewed; and the number of carts into which a visitor placed items. ECF 93 at 16, ¶ 114; ECF 99 at 26, ¶ 114 (admitted). Visits to the privacy policy do not appear in NaviStone's searchable database because that information is not used by NaviStone for any purpose. Kavanagh Dec. ¶ 12. Nor is a visitor's IP address stored in that database, for the same reason: IP addresses have no bearing on a visitor's likelihood of responding to direct mail. *Id.* Indeed, the only reason NaviStone received IP address information at all is because it is an inherent part of any internet communication. *Id.* ¶ 11.

The data lake is distinct from NaviStone's searchable database. *Id.* NaviStone's existing technology simply cannot cull or analyze data from the voluminous data lake of text. *Id.* ¶¶ 12–13, 16. NaviStone has never written software designed to pull text out of the data lake. *Id.* ¶ 16. Such an operation would be wholly distinct from and different than what NaviStone's existing software does. To use an analog example, a company can have a machine to sort a bag of marbles by size, but that does not make it reasonable to ask the company's engineers to retrofit that device to sort nuts, bolts, and nails in a landfill.

For NaviStone to do what Plaintiff asks would first require it redirecting one or more of its five database engineers to assess whether such a project would even be feasible. Assessing that would itself take several days. *Id.* ¶ 19. If the answer were yes, NaviStone would then need to write software code to do so through an iterative process, setting up new databases to store any extracted text and attempting to execute the code—with no guarantee of success. *Id.* ¶ 17, 20–23. If some or all the text did not exist in an identifiable or extractable form, the search could have incomplete results or no results at all. *Id.* ¶ 21.

While privacy class action lawsuits are frequently litigated against "big tech"—*e.g.*, Google, Meta, or Amazon—NaviStone is not in that category. It is a small Ohio startup with approximately forty-five total employees, and five database engineers. *Id.* ¶ 5. It does not have a sufficient supply of time, money, or employees to dedicate to Plaintiff's tasks without substantially impacting its business operations. Writing new code solely for the purpose of responding to discovery is highly burdensome and distracts from the company's core mission.

Plaintiff's only claimed need for this discovery is her desire to argue that only a small percentage of website visitors read the privacy policy, an argument which is both legally irrelevant and fully available to her without this discovery. It would also be data of questionable value

because (1) IP addresses are not constant, *i.e.*, a single device can transmit different IP addresses at different times, multiple devices can transmit the same IP address; (2) IP addresses can be "spoofed" or changed using virtual private networks (VPNs)[6]; and (3) ever-present bots can be indistinguishable from actual human beings visiting a website.[7] Nor would there be any information as to why the real human visitors to Harriet Carter's website, if identifiable at all, may have declined to view that site's privacy policy during any given visit (*e.g.*, because they read it previously, were already familiar with the company's information collection and usage practices from other sources, had no interest in it, *etc.*).

In sum, Plaintiff asks NaviStone to do exactly the kind of "extensive research" and document generation that answering written discovery does not require: to search a vast expanse of text for information that may or may not exist or be reliable by creating and producing software and databases that do not exist to generate documents reflecting information analyses that do not exist. *See Arena* 2017 WL 6513056 at *2; *Automotive Fin.*, *A*2018 WL 11446277 at *6; *cf.* Kavanagh Dec. ¶¶ 16–23. Plaintiff is not asking a large tech firm to query an existing database for relevant information known to be present; she is asking the Court to require a small start-up to *create* new databases, then search them on the off chance that requested information of little to no

---

[6]https://www.kaspersky.com/resource-center/threats/ip-spoofing ("IP spoofing, or IP address spoofing, refers to the creation of Internet Protocol (IP) packets with a false source IP address to impersonate another computer system.") (last viewed on February 28, 2023); https://cybernews.com/what-is-vpn/change-your-location-with-a-vpn/ ("VPNs are popular and easy-to-use tools for many reasons. Other than ensuring your cybersecurity, it's able to change your location and IP address to almost anywhere.") (last viewed on February 28, 2023)

[7]https://datadome.co/bot-management-protection/one-third-bad-bots-using-residential-ip-addresses/ ("To blend even more seamlessly in with human traffic, bad bots increasingly use residential IP addresses instead of data center IPs.…[and] nearly one in three bad bots' requests would pass for human traffic") (last viewed on February 28, 2023).

relevance might be present. *Cf. IQVIA, Inc. v. Veeva Sys., Inc.*, 2019 WL 6044938, *6–*7 (D.N.J. Nov. 14, 2019). Plaintiff's motion to compel further responses from NaviStone to her written discovery should be denied.

### 2. The Court should deny Plaintiff's request to re-depose NaviStone.

In addition to her motion to compel further responses to her written discovery requests, Plaintiff seeks leave to take a second Fed. R. Civ. P. 30(b)(6) deposition of NaviStone's corporate representative, Larry Kavanagh, to ask the same questions about the very same unknowns. Under Rule 30(a)(2)(A)(ii), a witness may not be deposed more than once absent leave of court. The factors courts consider in determining whether to grant a second deposition are the same as the general considerations relevant to the scope of discovery under Rule 26(a), including, once again, the importance of the discovery in resolving the issues.

NaviStone served objections to the 30(b)(6) notice. *See* Hart Dec., Ex. E. These objections largely speak for themselves and NaviStone incorporates each objection by reference here, but to summarize, as with Plaintiff's document requests, Plaintiff's central purpose is to obtain testimony concerning the number of visitors to Harriet Carter's website, the number of visitors to the privacy policy, and the time those visitors spent on that page. As stated above, this information—about *Harriet Carter*'s website statistics—is both beyond NaviStone's knowledge and irrelevant to the core issues remaining in the case.

Plaintiff offers little at all to support her request for a costly second deposition of NaviStone—or even the alternative of an "individual" deposition NaviStone's corporate representative—merely referencing, without explanation, "the guidance received from the Third Circuit on appeal" and a document received from Harriet Carter at the end of January 2023. ECF 137 at 14. Neither of these factors warrants an additional deposition of NaviStone. Indeed, Plaintiff

13

does not point to *any* specific guidance from the Third Circuit that supports a further deposition of NaviStone. Nor could she.

The Third Circuit remanded for resolution of (1) Plaintiff's location and (2) consent/the privacy policy. As explained earlier, NaviStone has no information concerning Plaintiff's location during her browsing, a fact entirely within her knowledge. And as to consent, again, this will be resolved by identifying the relevant privacy policy—which has been done—and analyzing its content. *See Popa*, 52 F.4th at 132. Since the claim before the Court is hers alone, and she has acknowledged not navigating to or reading Harriet Carter's privacy policy, what others may or may not have done—and why—is immaterial.

That leaves Plaintiff's attempt to justify the deposition based on an oblique reference to a single document produced by Harriet Carter in January 2023—namely, a copy of the Harriet Carter privacy policy as of June 2017. *See* Hart Dec., Ex. C. This document was produced by Harriet Carter, not NaviStone, and was derived from the publicly available Wayback Machine website archive. ECF 90 at 193–95. Plaintiff articulates no reason why she needs corporate testimony from NaviStone about a document which NaviStone never possessed and neither created nor produced. Plaintiff is free to ask Harriet Carter's corporate representative about this document, but there is no reason to require NaviStone to submit to a second deposition to discuss a co-defendant's document production.

In sum, NaviStone's president Larry Kavanagh, has been deposed for over seven hours over two days. Depositions come at great expense to NaviStone, not just in fees but, more critically, in the diversion of the company's leader to a time-consuming task of dealing with complex technological tasks which Plaintiff cannot tie to the narrow issues at hand. Plaintiff simply has not provided an adequate basis for visiting such burdens on NaviStone.

### III.  CONCLUSION

That this case is a significant one is not a license for Plaintiff to visit upon NaviStone a costly fishing expedition to search for, compile, and analyze data that has no bearing on the issues and which would fundamentally be unreliable.  The issues remaining in dispute are narrow, and the material necessary to resolve them lies in the existing record and discovery responses. The Court should not permit Plaintiff to take additional, burdensome discovery that cannot meaningfully assist the Court in reaching a prompt resolution of those issues. NaviStone respectfully requests that the Court deny Plaintiff's motion to compel.

Dated: March 1, 2023

Respectfully submitted,

Devin Chwastyk
I.D. No. 91852
MCNEES WALLACE & NURICK LLC
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108-1166
(717) 232-8000
(717) 237-5300 (fax)
dchwastyk@mcneeslaw.com

*/s/ David Swetnam-Burland*
David W. Bertoni (*pro hac vice*)
David Swetnam-Burland (*pro hac vice*)
Eamonn Hart (*pro hac vice*)
BRANN & ISAACSON
113 Lisbon St.
P.O. Box 3070
Lewiston, ME 04243-3070
(207) 786-3566
(207) 783-9325 (fax)
dbertoni@brannlaw.com
dsb@brannlaw.com
ehart@brannlaw.com

*Attorneys for Defendant NaviStone, Inc*